MILLARD F. DAVIS and LILLIAN F. DAVIS, complainants,

*v.*

CARL H. KOCH, defendant.

[Decided March 23d, 1929.]

*Mr. Philip Goodell,* for the complainants.

*Mr. Wilbur A. Heisley,* for the defendant.

BACKES, V. C.

The complainants exchanged their equity in an apartment house and paid money to boot for two bonds and mortgages. They charged the defendant with fraudulently misrepresenting them as to value of the security and the financing responsibility of one of the bondsmen, and they want the bargain undone. The mortgages have their genesis in the plans of the Public Service Corporation for a high power line across the state. The right-of-way, five hundred feet wide, runs through the mortgaged premises, two adjoining tracts near New Providence, Union county; one of thirty-one and thirty one-hundredths acres, formerly owned by the Cranes, the other eleven and eighty one-hundredths acres, by Stahl—forty-three and ten one-hundredths acres of waste lands. Early in 1926 one Kohen, with foresight, bought the tracts for $250 per acre, giving the Cranes $700 in cash and a mortgage for $6,300, and Stahl $500 in cash and a mortgage for $2,000. Within a month or two, May 28th, 1926, he conveyed to LeMoine, who gave Kohen his mortgage for $5,700,

and, he says, $4,000 in cash; at the rate approximately of $400 per acre. Three months later, August 16th, 1926, LeMoine conveyed to Young for $6,000 in cash and Young's mortgage for $8,650—this at $600 per acre. The $6,000 was furnished by the Public Service, and Young, a straw-man, by one Erkins, the company's right-of-way man, a real estate operator drafted from Long Island City. The right-of-way was excepted from Young's mortgage and released by the Cranes for $400; Stahl for $1,000 and by Kohen for $1,400; the total, $2,850, being paid out of the $6,000, i. e., the net price paid by the Public Service for its right-of-way. Young was a lather, financially irresponsible, living in poor quarters in Long Island City; a tool of Erkins. That Young was a dummy and his mortgage fictitious security and the deal a scheme of Erkins' to promote the right-of-way is apparent. LeMoine was a willing party or dupe and Kohen, his grantor, may have been; that is surmised. Erkins, at first, took a contract from LeMoine in the name of a Miss Wilson and without ado Young was substituted. The contract price was $25,800. That was of little moment to Erkins; with Young as mortgagor. LeMoine was not concerned. The first six months interest on the LeMoine-Kohen $5,700 mortgage was paid; it was deducted from LeMoine's $6,000 purchase price. LeMoine had been paid down money, $2,500, and the balance, $3,500, was disbursed by the Public Service, at the closing, to pay for the releases, taxes and other expenses, leaving a balance coming to LeMoine of $568.82; he was paid only $393.48; a check for the balance, $175.34, was made to Young's order, November 25th, 1926. Young's checks of November 26th for $147.07 and December 2d for $14 paid Kohen's interest. Erkins adjusted. Young had no hand in it except to sign. LeMoine says someone, he don't know who, paid him the first six months' interest on the Young mortgage. It was surely not Young. LeMoine, knowing the mortgage to have no sales value, used it for trading. He took an apartment house in exchange from Fish, and regretted it; we are not told how Fish felt about it. Fish traded it to his cousin, Koch, the defendant, for an equity in a house. Koch at that time said he wouldn't touch it unless he got the one

ahead, and the cousin promptly made a deal with Kohen for it. Fish assigned to Koch his $8,650 mortgage on October 18th, 1927, and Kohen, two days later, the 20th. Koch listed them for trade with the broker retained by the Davises, the complainants, to sell their property and the broker-salesman with Koch approached the Davises. The Davises did not care for second mortgages and a house in Verona was suggested as an exchange and after inspection was rejected. Then the Davises were taken to the forty-three acres and they had little appeal. They discounted Koch's puffing the tracts to be worth $1,000 per acre, but they were impressed with Koch's repeated representations that Young was a reliable man who owned a lot of real estate and that he paid his interest promptly and that the mortgages were all right. "O. K." The representations as to Young were not only untruthful, but were falsely and deceitfully made. Koch denies making them, but we need only look to the deceptive covenants in his assignments to the Davises to be assured where the truth lies. In the assignments, December 8th, 1927, he covenanted that the principal of $8,650 was owing on the Young-LeMoine mortgage with interest from the last due day, August 16th, 1927, and the principal, $4,700, on the LeMoine-Kohen mortgage (it had been reduced by $1,400, the price of Kohen's release of the right-of-way), with interest from the last due day, November 28th, 1927. The implication that the interest had been paid up was false and intended to mislead. Koch had collected none during the short time he held the mortgages and he knew his cousin, Fish, had not, for in Fish's assignment (October, 1927) he covenanted to Koch that the principal of $8,650 "with interest from February 16th, 1927," was due, and Kohen in his assignment to him (October 20th, 1927) covenanted that $5,700 "and interest from November 28th, 1926," was due. These covenants refute Koch's testimony that interest had been paid to his cousin. When the defendant made the representation as to Young's standing he had made his own investigation of Young and knew him to be irresponsible and that he was, as well, a year in default in the Crane and Stahl interest, for shortly before he had himself paid each of them two installments then in arrears.

Now, we may pass by the puffery, that the forty-three acres were worth $1,000 per acre, as non-actionable. The Davises saw for themselves and could judge for themselves. The extravagant commendation in this respect, however, had some influence on them and the false and deceitful representation as to Young's financial standing and responsibility persuaded them. They refused to respond to the mortgage security, but the dazzling word picture of Young—the wealthy land owner and prompt interest paying bondsman—they believed; they were gulled. The defendant will have to return the property.